Nott,' J.,
delivered the opinion of the court:
In the class of cases to which this suit belongs a right of action is given, in effect, by the Act 2d March, 1891 (26 Stat. L., p. 822), to owners or heirs of owners who lost their lands in two parishes in the State of South Carolina, St. Helena and St. Lukes, by direct-tax sales during the civil war. The divestiture of this property, though by legal proceedings, was exceedingly pitiable, and when the harsher judgments of the war had softened and passed away Congress deemed it an act of justice as well as mercy to award something in the nature of restitution. The amount of restitution in this class of cases was $5 an acre.
On the 8th March, 1892, there was pending in the Treasury Department the claim of Eobert G. Norton and others, heirs of Eliza Wallace, for this statutory restitution of $5 an acre for a farm of 475 acres, in the parish of St. Helena. On that day (March 8, 1892) the Secretary transmitted the claim to this court under Eevised Statutes, section 1063, and on the 8th of October, 1892, the claimants, Norton et al., filed their petition against the United States in this court. On the 26th February, 1893, the case proceeded to judgment. The judgment was soon after paid and satisfied.
After the judgment had been paid and satisfied the claimants in the present suit presented their demand to the Secretary of the Treasury and asked the same restitution for the same property. The Secretary likewise transmitted their claim to this court under the Eevised Statutes, aud on the 23d May, 1893, the claimants came in and filed their petition. The case therefore presents the question whether the Government can be compelled to pay over again, or whether the present claimants, if they have the higher title, are precluded from now setting it up; that is to say, whether the judgment in the former case will have the same effect that it undeniably would have if the present claimants had been made parties to the suit aud had then neglected to assert their rights.
*348 The facts out of which this controversy springs are peculiar. In 1834, it is now conceded by all parties, the property was owned by and in possession of one Dr. Branson, who in that year died, leaving’ a widow, but no issue. Mrs. Branson continued in the actual and peaceable possession of the property -./until the capture of Port Boyal in 1861, and constructively in possession until its sale under the direct-tax acts, March 10, 1868, when it was bid in by the United States. After the death of her first husband she married Mr. Parm Wallace, and the estate in time became commonly known as the Wallace place, and it is so described in the records of the direct tax commissioner for the State of South Carolina.
Mr. Wallace died before his wife, and she died without issue after the direct-tax sale. The parties in the former suit of Norton et al. were her heirs, and as such recovered.
It has been one of the unfortunate peculiarities of all these direct-tax cases under the act of'1891 that the evidence has rarely, if ever, come up to the requirements of an action in ejectment. When the forces of the United States in 1861 appeared before these islands, the terrified inhabitants fled, abandoning houses and homes and household effects. Their deeds and documents and muniments of title were forgotten or lost. Still more unfortunately, the public records of the two parishes were destroyed,, and, as a general thing, conveyances and wills and all documentary evidence of title to realty in those parishes vanished from the face of the earth. The court therefore has had to rely in the most of these cases upon uninterrupted possession and undisputed acts of ownership for a number of years, and to relinquish the hope of any one claimant producing a paper title.
In the case of the Wallace heirs it was shown by testimony which was conclusive, and which is still undisputed, that Mrs. Wallace was in possession of the property from the death of her first husband in 1834 until her flight in 1861. Witnesses of unquestionable respectability testified that she exercised over it all rights of ownership and that she was the owner. The latter statement was of course a conclusion of the witnesses, which did not influence the mind of the court. It was also stated by the witnesses that “ she got the plantation by and through her former husband,” and that “ she acquired the *349 property through her first husband.” The manner in which she acquired it was not shown.
Under the laws of South Carolina, if Dr. Branson had died intestate his widow would have taken only one-half of the plantation 5 and as he left brothers and sisters, or their representatives, who would have been entitled to the other half, but who had asserted no such right during a period of more than twenty-one years, and who did not appear and assert a right to the restitution fund, it seemed a reasonable inference that Mrs. Branson had acquired in some way the whole estate. It might have come to her by devise; it might have come to her by purchase,- .but so far as the evidence of undisturbed possession could raise a presumption of title, it appeared to have been in some way vested in her.
The claimants in the present suit attempt to produce a will of Dr. Branson, or rather, it should be said, proof of the existence and loss of a will and secondary evidence of its contents. It is objected by the defendants that this secondary evidence is incompetent and inadmissible. The court, is of the opinion that the objection is well taken and that the secondary evidence must be excluded. The witnesses do not give the contents of the missing instrument. A great number of years have elapsed since they last saw it, and their testimony is nothing more than their conclusions of its purpose and effect.With the exclusion of this evidence as incompetent, the present case fails upon the facts; but as it is possible that the missing will may yet be found, and as similar suits may hereafter be brought by other parties, the court will proceed to the consideration of the fundamental question of law involved in the case, and that question is whether the United States in this class of cases can be held liable twice over, and after having paid once under the judgment of a court of competent jurisdiction can be made to pay a second time.
If the land of Dr. Branson and the other owners in these cases had still been in the possession of the Government, and Congress had provided that restitution should be made and possession restored on their coming into this court and establishing their right and title by a suit in the nature of an action of ejectment, and judgment had gone in favor of the Wallace heirs and they had been put in possession of the land, no one would suppose that a second suit against the Government could *350 be maintained, by the Branson heirs, though they set up a higher title. Their remedy, if any, would be against the parties in possession, the Wallace heirs, who, if they recovered wrongfully and without notice to the rightful heirs, might be regarded as holding the property as trustees for those who were in law and equity entitled to it. Whether tbe present claimants can maintain a similar action for the fund which represented the land is a question not before this court, and concerning it no opinion is expressed.
The abandoned and captured property cases are somewhat analogous to these. There, as here, no contract existed, express or implied. The right of action grew entirely out of the provisions of a statute, and beyond those provisions the law imposed no personal liability upon the Government. Where the captured property was lost or destroyed or stolen, or its proceeds given away to the wrong party, the owner was without redress. The proceeds were a fund in equity, and the suit of the claimant was a suit in equity to obtain the fund. Fortunately for the administration of justice, Congress exercised the foresight of requiring all suits to be brought within a brief jurisdictional period of two years, so that all of the parties seeking redress were before the court at the same time; and the court sitting as a court of equity was able to make conflicting claimants interplead and settle their adverse rights by a single decree.
This act of 1891, unfortunately, contains no such provision. The dispossessed owners are not required to present their demands to the Treasury within any designated period. But, nevertheless, that provision in the abandoned or captured property act was for the protection of the owners and not for the protection of the United States. Its absence in the act of 1891 imposes a risk upon the nondiligent owner, but does not .impose a double liability upon the United States. In the opinion of the court, all that Congress have done here is to substitute a fund of indemnity for the land which the Government took by its tax sales. , The Government does not assume a personal liability; it does not warrant the title of the person to whom it pays the money. When the fund is gone the remedy is exhausted. In this case the $2,375 sought to be recovered for 475 acres of land in the St. Helena Parish, described by metes and bounds, and popularly known as the *351 Wallace place, represented a specific thing as unequivocally as if it had been specifically named in the statute; as unequivocally as a fund of $5,000 in the Treasury represented a specific parcel of 20 bales of cotton owned by a certain individual in Charleston or Savannah. In the latter case Congress said, Let whoever was the owner of that parcel of cotton and who is entitled to its proceeds in the Treasury present his claim within a period of two years; in the former, Congress said, Let whoever was the owner of the Wallace place present his claim for indemnity to the Secretary of the Treasury whenever he pleases. In both cases Congress intended that when the money should be paid out of the Treasury the liability of the United States should end.
This is not a case of a defendant owing money to one man and paying it to another at his peril. Prior to the act of 1891 the Government was under no legal obligation to these claimants, the former owners of property in St. Helena and St. Luke’s. Their causes of action were created by the statute; the rights conferred on them were not debts, but gifts. If the statute had been repealed before payments were made, no vested right would have been disturbed. The Government here held the money as trustee for the rightful owner (Irene Taylor’s Case, 104 U. S. R., 216) and the trustee did not act indiscreetly or, indeed, voluntarily, but under the compulsion of a judgment. The object of the Treasury in sending the application here was to secure protection for the trustee. Neither is this a case of public officers paying money without authority of law to one ■who is not lawfully entitled to receive it. The Secretary of the Treasury did all that he could do to protect the United States and secure the true owner’s rights— he compelled the first claimants to bring an action. The Government then had no alternative, and paid under the compulsion of a judgment rendered by a court of competent jurisdiction. In such a case somebody must suffer, and assuredly it should not be the innocent party. The Government exercised all the vigilance that it was possible for it to exercise; the claimants did not.
It is also manifest that if the Government can be made to pay a second time in these cases it can be made to pay a third and a fourth and no end of times for the same property, inas *352 much as the statute of limitatious will not begin to run against a party until lie applies at tbe Treasury for the money (Taylor’s Case, supra), and that no amount of vigilance on the part of the Treasury, or on the part of the Attorney-General, or on the part of the court can guard against such results. In the instance of this plantation, the first - claimants recovered as heirs. Then someone might have come in with a deed from Mrs. Wallace, executed after she abandoned the plantation but before the tax sale, and he might have recovered as owner at the time of sale. And then the present claimants might have come in with the will of Dr. Branson and recovered a third time.
It is proper to add that this is the first and only case where dual claims have been presented at different times; that is, this is the first and only case where the defendants have been called upon to pay a second time for the tax sale of the same property. The court regrets that the adverse parties were not both in court at the same time, so that they might have been brought face to face and required to interplead, as in the abandoned or captured property cases. But it will be observed that the judgment in the former case was not rendered until the 26th February, 1893, and probably was not paid until some days later, and consequently that the present claimants had a period equal substantially to that ivliich was given to owners of captured property, and that during this period and until the 23d May, 1893, they slept on their rights.
The judgment of the court is that the petition be dismissed.